| Debtor | Berwick Management LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

**Southern District of Texas**
(State)

Case number *(if known)*: _____     Chapter    11

☐ Check if this is an amended filing

<u>Official Form 201</u>

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/25

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

| | | |
|---|---|---|
| 1. | **Debtor's Name** | **Berwick Management LLC** |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | **n/a** |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **02-3310402** |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **2015 W. Front Street** | |
| Number          Street | Number          Street |
| **Berwick          PA     18603** | |
| City          State     Zip Code | City          State     Zip Code |
| | **Location of principal assets, if different from principal place of business** |
| **Columbia** | |
| County | Number          Street |
| | City          State     Zip Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | https://dgamericas.com/ |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | | ☐ Partnership (excluding LLP) |
| | | ☐ Other. Specify: _____ |

Debtor    Berwick Management LLC
          _____          Case number *(if known)*    _____
          Name

| | |
|---|---|
| **7.** **Describe debtor's business** | A. *Check One:* |
| | ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A)) |
| | ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B)) |
| | ☐ Railroad (as defined in 11 U.S.C. § 101(44)) |
| | ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A)) |
| | ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6)) |
| | ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3)) |
| | ☒ None of the above |

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .
**3399(Other Miscellaneous Manufacturing)**

| | |
|---|---|
| **8.** **Under which chapter of the Bankruptcy Code is the debtor filing?** | *Check One:*<br>☐ Chapter 7 |
| | ☐ Chapter 9 |
| | ☒ Chapter 11.  *Check **all** that apply:* |

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

☐  A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the **Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11** (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

| | | |
|---|---|---|
| **9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**<br><br>If more than 2 cases, attach a separate list. | ☒ No<br>☐ Yes | District _____  When _____  Case number _____<br>                                             MM/DD/YYYY<br>District _____  When _____  Case number _____<br>                                             MM/DD/YYYY |

| | | |
|---|---|---|
| **10.** **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**<br><br>List all cases. If more than 1, attach a separate list. | ☐ No<br>☒ Yes | Debtor **See Attached Rider 1**    Relationship _____<br><br>District _____<br><br>                                  When: **07/03/2025**<br>Case number, if known _____    MM / DD / YYYY |

| Debtor | Berwick Management LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

_____
Number          Street

_____
City                      State      Zip Code

**Is the property insured?**

☐ No

☐ Yes.  Insurance agency _____

Contact name _____

Phone _____

---

| | **Statistical and administrative information** |
|---|---|

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors ***

***Consolidated for all Debtors.**

| | | |
|---|---|---|
| ☐ 1-49 | ☒ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets***

***Consolidated for all Debtors.**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☒ $100,000,001-$500 million | ☐ More than $50 billion |

**16. Estimated liabilities***

***Consolidated for all Debtors.**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☒ $100,000,001-$500 million | ☐ More than $50 billion |

| Debtor | Berwick Management LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

- I have been authorized to file this petition on behalf of the debtor.

- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on     07/03/2025
               MM/ DD / YYYY

✗     */s/ Brett M. Anderson*                    Brett M. Anderson
      Signature of authorized representative of debtor     Printed name

Title     **Chief Strategy Officer**

**18. Signature of attorney**

✗     */s/ Caroline A. Reckler*          Date     07/03/2025
      Signature of attorney for debtor              MM/DD/YYYY

      **Caroline A. Reckler**

      **Latham & Watkins LLP**
      Firm name

      **330 North Wabash Avenue, Suite 2800**
      Number          Street

      **Chicago**                              **IL**        **60611**
      City                                     State        ZIP Code

      **(312) 876-7633**                       caroline.reckler@lw.com
      Contact phone                            Email address

      **IL Bar No. 6275746  *(Admitted to practice
      in the Southern District of Texas)***          **IL**
      Bar number                               State

## Rider 1

### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the affiliated entities listed below (including the debtor in this chapter 11 case, collectively, the "***Debtors***") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas.  Contemporaneously with the filing of their voluntary petitions, the Debtors are filing a motion with the Court requesting that their chapter 11 cases be consolidated for procedural purposes only and jointly administered.

| Entity Name | Federal Employee Identification Number (EIN) |
|---|---|
| Anker Play Products, LLC | 81-2856593 |
| Berwick Management LLC | 02-3310402 |
| Berwick Offray LLC | 23-3011481 |
| BOC Distribution, Inc | 26-4596196 |
| C.R. Gibson, LLC | 33-1189007 |
| CRG Distribution, Inc. | 27-0786188 |
| CSS Industries, Inc. | 13-1920657 |
| IG Design Group (Lang), Inc. | 27-0765877 |
| IG Design Group Americas, Inc. | 04-2953448 |
| Impact Innovations, Inc. | 41-2020626 |
| Impact Paper Products, LLC | 26-3411991 |
| Lion Ribbon Company, LLC | 04-3592029 |
| Lion Ribbon Texas Corp. | 05-0578748 |
| McCall Distribution, Inc. | 81-4516940 |
| Paper Magic Distribution, Inc. | 20-2660092 |
| Paper Magic Group, LLC | 23-1918841 |
| Philadelphia Industries, LLC | 51-0275114 |
| Simplicity Creative Corp. | 82-2888191 |
| The Lang Companies, Inc. | 27-0766664 |
| The McCall Pattern Company, Inc. | 81-4500619 |
| Variety Accessories, LLC | 26-0595208 |
| W.J.S. Furniture, Inc. | 13-1955476 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Berwick Management LLC, | ) | Case No. 25-_____(____) |
|  | ) |  |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

| Equity Interest Holder | Approximate Percentage of Equity Interests Held |
|---|---|
| Berwick Offray LLC | 100% |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Berwick Management LLC, | Case No. 25-_____(___) |
| Debtor. | |

## LIST OF EQUITY SECURITY HOLDERS

Pursuant to Rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure, the above-captioned debtor and debtor in possession (the "**Debtor**") respectfully represents that the following is the list of holders of the Debtor's sole class of equity or membership interests:

☐    There are no equity security holders or corporations that directly or indirectly own 10% or more  of any class of the Debtor's equity interest.

☒    The following are the Debtor's equity security holders (list holders of each class, showing the number and kind of interests registered in the name of each holder, and the last known address or place of business of each holder):

| Name and Last Known Address of Place of Business of Holder | Kind/Class of Interest | Percentage of Interests Held |
|---|---|---|
| Berwick Offray LLC<br>2015 W. Front Street<br>Berwick, PA 18603 | Shares | 100% |

Fill in this information to identify the case:

Debtor name:  Lion Ribbon Texas Corp., *et al.*

United States Bankruptcy Court for the: Southern District of Texas

Case number (If known):

☐ Check if this is an amended filing

Official Form 204

### Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders    12/15

A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor | Complete mailing address, and employee, agents, or department familiar with claim | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim if the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | HATFIELD & ASSOCIATES LLC | HATFIELD & ASSOCIATES LLC<br>Tiffany Osbahr<br>5100 POPLAR AVE, STE 3119,<br>PO BOX. 770868<br>MEMPHIS, TN 38117 | HATFIELD & ASSOCIATES LLC<br>Tiffany Osbahr<br>PHONE: 901-507-2615<br>FAX:<br>EMAIL: tosbahr@hatfieldandassociates.com | Trade Payables | | | | $1,811,937.88 |
| 2 | HONG KONG RUI SHENG YUAN LIMITED | HONG KONG RUI SHENG YUAN LIMITED<br>Tia Yu<br>FLAT/RM 1001 10/F EASEY COMMERCIAL BLDG,<br>253-261 HENNESSEY RD<br>HONG KONG, CN | HONG KONG RUI SHENG YUAN LIMITED<br>Tia Yu<br>PHONE: 011-86-20-34776121<br>FAX:<br>EMAIL: ls_tia@126.com | Trade Payables | | | | $1,506,544.51 |
| 3 | STAR MOON TOYS (HK) COMPANY LIMITED | STAR MOON TOYS (HK) COMPANY LIMITED<br>Lx<br>WESTERN LONGQUAN ROAD, NORTHEN XUEFU ROAD, TAFENG TOWN<br>LANSHAN COUNTY<br>HUNAN PROVINCE<br>CHINA | STAR MOON TOYS (HK) COMPANY LIMITED<br>Lx<br>PHONE: 13532396331<br>FAX: 852-2314-8922<br>EMAIL: lx@starmoonchina.com | Trade Payables | | | | $767,680.49 |
| 4 | MAX FAME GROUP | MAX FAME GROUP<br>Grace Lin<br>CHONG-HO INDUSTRIAL AREA, QING-TING TOWN, DONGGUAN, GD<br>CHINA | MAX FAME GROUP<br>Grace Lin<br>PHONE: 86-15924263658<br>FAX: 86-769-87313080<br>EMAIL: gracelin@max-fame.com | Trade Payables | | | | $733,420.58 |
| 5 | DEAR YEAR BROTHERS MFG CO | DEAR YEAR BROTHERS MFG CO<br>Emily Wang<br>12 F, NO 107-7 SEC 2, KEELUNG RD, TAIPEI,<br>TAIWAN | DEAR YEAR BROTHERS MFG CO<br>Emily Wang<br>PHONE: 011-886-27360683<br>FAX: 886-49-2251538<br>EMAIL: emilywang@dearyear.com.tw | Trade Payables | | | | $716,887.68 |
| 6 | NOVELTY HANDICRAFTS CO LTD | NOVELTY HANDICRAFTS CO LTD<br>Sandy Chang<br>RM 2, 1F, NO 446, SHIHGUAN RD, CAOTUN TOWNSHIP<br>NANTOU COUNTY, 54254<br>TAIWAN | NOVELTY HANDICRAFTS CO LTD<br>Sandy Chang<br>PHONE: 88- 649-2313345<br>FAX:<br>EMAIL: group7@noveltyhandicrafts.com | Trade Payables | | | | $682,350.59 |
| 7 | DONGGUAN ZHONGHAO COLOR | DONGGUAN ZHONGHAO COLOR<br>Vivian Yip<br>NO 8, WUSONG THIRD ST, YUWU VLG,<br>DONGCHINANG DIST<br>DONGGUAN, GD, 523071<br>CHINA | DONGGUAN ZHONGHAO COLOR<br>Vivian Yip<br>PHONE: 86-769-38839001<br>FAX:<br>EMAIL: vivianyyip@163.com | Trade Payables | | | | $673,514.52 |
| 8 | QINGDAO DEEPACK CO LTD | QINGDAO DEEPACK CO LTD<br>Boris Huang<br>NO 61 WANGXIN RD, PROV HIGH & NEW TECH IND DEVT ZONE, JIMO<br>QINGDAO, SHANDONG<br>CHINA | QINGDAO DEEPACK CO LTD<br>Boris Huang<br>PHONE: 86-532-84557668<br>FAX:<br>EMAIL: boris@deepack.com.cn | Trade Payables | | | | $658,502.18 |
| 9 | NINGBO REYUI ECONOMIC & TRADE CO LTD | NINGBO REYUI ECONOMIC & TRADE CO LTD<br>Maggie Luo<br>18TH FL, JINSHAN BLDG, NO 555 CHANGSHOU SOUTH RD, NINGBO, ZHEJIANG, CHINA | NINGBO REYUI ECONOMIC & TRADE CO LTD<br>Maggie Luo<br>PHONE: 57482809137<br>FAX:<br>EMAIL: betty@chinareyda.com | Trade Payables | | | | $644,329.88 |
| 10 | MIT-LASERTECH CORP | MIT-LASERTECH CORP<br>Gina Hsiao<br>NO. 6, ROAD 34, INDUSTRIAL PARK, TAICHUNG,<br>TAIWAN | MIT-LASERTECH CORP<br>Gina Hsiao<br>PHONE: 886-4-23581533<br>FAX: 886-4-23581532<br>EMAIL: gina@mitter.com.tw | Trade Payables | | | | $598,974.62 |
| 11 | XIANJU CHENGFENG CRAFT CO LTD | XIANJU CHENGFENG CRAFT CO LTD<br>Annie Xu<br>THE EXIT OF TAIJIN EXPRESSWAY, HENGXI,<br>XIANJU ZHEJIANG<br>CHINA | XIANJU CHENGFENG CRAFT CO LTD<br>Annie Xu<br>PHONE: 0576-87073838<br>FAX:<br>EMAIL: annie@chengfengarts.com | Trade Payables | | | | $559,555.53 |
| 12 | OUTLOOK GROUP LLC | OUTLOOK GROUP LLC<br>Marsha Malnory<br>PO BOX 714516<br>CINCINNATI, OH 45271-4516 | OUTLOOK GROUP LLC<br>Marsha Malnory<br>PHONE: 920-727-8547<br>FAX:<br>EMAIL: mmalnory@outlookgroup.com | Trade Payables | | | | $532,469.11 |

| | Name of creditor | Complete mailing address, and employee, agents, or department familiar with claim | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim if the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 13 | FAIRTON ASIA LIMITED | FAIRTON ASIA LIMITED<br>Beryl Zhang/Helen<br>UNIT 01, 13/F, PARAMOUNT BLDG<br>12 KA YIP ST, CHAI WAN<br>HONG KONG, CHINA | FAIRTON ASIA LIMITED<br>Beryl Zhang/Helen<br>PHONE: 86-574-28827088<br>FAX: 86-562-983-7215<br>EMAIL: helen@guangbo.net<br>oversea1@guangbo.net | Trade Payables | | | | $501,819.01 |
| 14 | CONNEMARA CONVERTING | CONNEMARA CONVERTING<br>Nancy Miller<br>544 TERRITORIAL DRIVE<br>BOLINGBROOK, IL, 60440 | CONNEMARA CONVERTING<br>Nancy Miller<br>PHONE: 630-771-1209<br>FAX: 630-771-9358<br>EMAIL: nmiller@cmaraconverting.com | Trade Payables | | | | $496,641.22 |
| 15 | HUNAN LIMEI PRINTING CO | HUNAN LIMEI PRINTING CO<br>Ji Yong, Chen<br>NO 206 HUANGGU RD<br>HUANGHUA TOWER<br>CHANGSHA, , HU, CHINA | HUNAN LIMEI PRINTING CO<br>Ji Yong, Chen<br>PHONE: 13873122412<br>FAX:<br>EMAIL: tianyuan-scb@vip.163.com | Trade Payables | | | | $491,911.31 |
| 16 | SUN POWER INTERNATIONAL LTD | SUN POWER INTERNATIONAL LTD<br>Cherry Li<br>UNIT B,12/F<br>SUCCESS COMMERCIAL BLDG<br>245-251 HENNESSY RD, WN<br>HONG KONG, CHINA | SUN POWER INTERNATIONAL LTD<br>Cherry Li<br>PHONE: 86 574 2266 7688<br>FAX:<br>EMAIL: cherry@feihong.sina.net | Trade Payables | | | | $477,243.72 |
| 17 | TYOGA CONTAINER COMPANY INC | TYOGA CONTAINER COMPANY INC<br>Marc Sortman<br>9 FISH ST<br>PO BOX 517<br>TIOGA, PA, 16946 | TYOGA CONTAINER COMPANY INC<br>Marc Sortman<br>PHONE: 570-835-5296<br>FAX: 570-835-5045<br>EMAIL: marc@tyogacontainer.com | Trade Payables | | | | $462,726.02 |
| 18 | WENZHOU FUJIE POLYTRON TECHNOLOGIES INC | WENZHOU FUJIE POLYTRON TECHNOLOGIES INC<br>Jacky Zhou<br>BLOCK 5, DEMONSTRATION INDUSTRY PARK, LONGGANG TOWN<br>WENZHOU, ZJ, 325802<br>CHINA | WENZHOU FUJIE POLYTRON TECHNOLOGIES INC<br>Jacky Zhou<br>PHONE: 86-577-59921983<br>FAX:<br>EMAIL: jackyzhou@chinafujie.com | Trade Payables | | | | $458,830.11 |
| 19 | GOULD PAPER CORPORATION | GOULD PAPER CORPORATION<br>Rosanne Burns<br>360 MADISON AVENUE<br>9TH FLOOR<br>NEW YORK, NY 10017 | GOULD PAPER CORPORATION<br>Rosanne Burns<br>PHONE: 212-547-3440<br>FAX: 212-481-0392<br>EMAIL: rburns@ovol.us | Trade Payables | | | | $446,687.53 |
| 20 | POLY CRAFT INDUSTRIES CORP | POLY CRAFT INDUSTRIES CORP<br>James Freiberg<br>40 RANICK RD<br>HAUPPAUGE, NY, 11788 | POLY CRAFT INDUSTRIES CORP<br>James Freiberg<br>PHONE: 216-496-9252<br>FAX: 951-296-0867<br>EMAIL: james.freiberg@polycraftind.com | Trade Payables | | | | $443,650.09 |
| 21 | NINGBO FREEWILL PLASTIC CO LTD | NINGBO FREEWILL PLASTIC CO LTD<br>Juicy Zhu<br>NO 1504 HENGYE BLDG<br>NO 158 TAIAN RD<br>NINGBO, 315000, CHINA | NINGBO FREEWILL PLASTIC CO LTD<br>Juicy Zhu<br>PHONE: 86-01596890706<br>FAX:<br>EMAIL: JuicyZhu@nbfreewill.com | Trade Payables | | | | $429,151.51 |
| 22 | PRATT INDUSTRIES | PRATT INDUSTRIES<br>Vicki Morris<br>1975 SARASOTA PKWY<br>CONYERS, GA, 30013 | PRATT INDUSTRIES<br>Vicki Morris<br>PHONE: 678-607-1472<br>FAX: 470-704-6986<br>EMAIL: vmorris@prattindustries.com | Trade Payables | | | | $419,581.75 |
| 23 | JINJIN LIMITED | JINJIN LIMITED<br>Ricky Lim<br>29F GLASS TOWER<br>946-1 DEACHI-DONG<br>SEOUL, , 04535<br>SOUTH KOREA | JINJIN LIMITED<br>Ricky Lim<br>PHONE: 82-2-5677711<br>FAX: 82-2-567-3211<br>EMAIL: ricky_lim@dualtrade.co.kr | Trade Payables | | | | $415,464.00 |
| 24 | LION INDUSTRIAL PROPERTIES LP | LION INDUSTRIAL PROPERTIES LP<br>Keith Retterer<br>6250 NORTH RIVER ROAD<br>SUITE 11-100<br>ROSEMONT, IL 60018 | LION INDUSTRIAL PROPERTIES LP<br>Keith Retterer<br>PHONE: 630-217-0408<br>FAX:<br>EMAIL: Keith.Retterer@colliers.com | Rent Payable | | | | $410,890.64 |
| 25 | SUN CHEMICAL CORPORATION | SUN CHEMICAL CORPORATION<br>La Tonya Ellis<br>PO BOX 2193<br>CAROL STREAM, IL, 60132-2193 | SUN CHEMICAL CORPORATION<br>La Tonya Ellis<br>PHONE: 800-874-7950<br>FAX: 513-681-4797<br>EMAIL: latonya.ellis@sunchemical.com | Trade Payables | | | | $401,689.54 |
| 26 | R&H TRADING CO LTD | R&H TRADING CO LTD<br>Mary Wang<br>XINDACHENG ROOM 916<br>NO.888 EAST FENQQI ROAD, SHANGCHENG DISTRICT<br>HANGZHOU CITY<br>ZHEJIANG PROVINCE, CHINA | R&H TRADING CO LTD<br>Mary Wang<br>PHONE: 0571-8653 3806<br>FAX:<br>EMAIL: mary_wang@hzlandr.com | Trade Payables | | | | $390,309.28 |
| 27 | MPD MANUFACTURING INC | MPD MANUFACTURING INC<br>Alex Noriega<br>7011 MARKET AVE<br>EL PASO, TX 79915 | MPD MANUFACTURING INC<br>Alex Noriega<br>PHONE: 915-892-3755<br>FAX:<br>EMAIL: anoriega@edcms.com | Trade Payables | | | | $388,762.80 |

| | Name of creditor | Complete mailing address, and employee, agents, or department familiar with claim | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br><br>if the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 28 | MASS POLYMERS CORPORATION | MASS POLYMERS CORPORATION<br>Jill Blecher<br>1140 ROUTE 22 EASAT<br>SUITE 109<br>BRIDGEWATER, NJ, 08807 | MASS POLYMERS CORPORATION<br>Jill Blecher<br>PHONE: 908-725-3133<br>FAX: 908.725.9677<br>EMAIL: j.blecher@massspolymers.com | Trade Payables | | | | $385,256.01 |
| 29 | GPFM HOLDINGS LLC | GPFM HOLDINGS LLC<br>Vianey Casillas<br>133 PEACHTREE ST NE<br>ATLANTA, GA, 30303 US | GPFM HOLDINGS LLC<br>Vianey Casillas<br>PHONE: 404-652-2677<br>FAX:<br>EMAIL: vianey.casillas@kochcc.com | Trade Payables | | | | $353,298.57 |
| 30 | MCKEE & MCFARLAND INC | MCKEE & MCFARLAND INC<br>Tina Croom<br>PO BOX 171133<br>MEMPHIS, TN 38187-1133 | MCKEE & MCFARLAND INC<br>Tina Croom<br>PHONE: 901-680-7700<br>FAX:<br>EMAIL: tina.croom@colliers.com | Rent Payable | | | | $336,235.50 |

Fill in this information to identify the case and this filing:

Debtor Name  Berwick Management LLC

United States Bankruptcy Court for the:   **Southern District of Texas**

(State)

Case number (If known):

## Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors          12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  Schedule A/B: Assets-Real and Personal Property *(Official Form 206A/B)*

☐  Schedule D: Creditors Who Have Claims Secured by Property *(Official Form 206D)*

☐  Schedule E/F: Creditors Who Have Unsecured Claims *(Official Form 206E/F)*

☐  Schedule G: Executory Contracts and Unexpired Leases *(Official Form 206G)*

☐  Schedule H: Codebtors *(Official Form 206H)*

☐  Summary of Assets and Liabilities for Non-Individuals *(Official Form 206Sum)*

☐  Amended Schedule ____

☒  Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (Official Form 204)

☒  Other document that requires a declaration **Corporate Ownership Statement and List of Equity Security Holders**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on

|  |  |
|---|---|
| 07/03/2025 | ☒ */s/ Brett M. Anderson* |
| MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
|  | **Brett M. Anderson** |
|  | Printed name |
|  | **Chief Strategy Officer** |
|  | Position or relationship to debtor |

**OMNIBUS ACTION BY WRITTEN CONSENT**
**OF THE GOVERNING AUTHORITIES OF**
**EACH ENTITY LISTED ON SCHEDULE 3 HERETO**

**July 3, 2025**

The undersigned, being (i) the sole shareholder or sole member, as listed in <u>Schedule 1</u> hereto (collectively, the "<u>Equityholders</u>") and (ii) the manager or all of the members of the board of directors, the board of governors or the board of managers, as applicable, as listed in <u>Schedule 2</u> hereto (collectively, the "<u>Boards</u>", and together with the Equityholders, each, a "<u>Governing Authority</u>" and collectively, the "<u>Governing Authorities</u>"), of the applicable entities listed on <u>Schedule 3</u> hereto (each, a "<u>Filing Entity</u>" and collectively, the "<u>Filing Entities</u>"), hereby consent to the adoption of, and do hereby adopt the following resolutions by written consent of the applicable Governing Authority for each applicable Filing Entity (provided, that Mr. Kaup hereby recuses himself with respect to the resolutions relating to the Liquidation Services Documents and the DIP Transactions (each, as defined below) and is not deemed to have voted or consented with respect to such matters), in accordance with applicable law and the governing documents of the applicable Filing Entity, without a meeting and with the same force and effect as if said resolutions were adopted at a meeting of the applicable Governing Authority duly called and legally held on the date set forth above (this "<u>Omnibus Consent</u>") and hereby direct that this Omnibus Consent be filed in the minutes of the applicable Governing Authority of each Filing Entity:

**CHAPTER 11 CASES**

WHEREAS, each of the Filing Entities is a direct or indirect wholly owned subsidiary of HUK 168 Limited, a United Kingdom limited company ("<u>HUK</u>");

WHEREAS, each of the undersigned Governing Authorities of the Filing Entities has had the opportunity to consult with management and the legal and financial advisors of such Filing Entity to fully consider, and has considered, the restructuring and strategic alternatives available to such Filing Entity and the impact of the foregoing on such Filing Entity's business; and

WHEREAS, each of the Governing Authorities has reviewed and evaluated proposed restructuring transactions involving the Filing Entities.

NOW, THEREFORE, BE IT RESOLVED, that, in the judgment of each of the Governing Authorities, it is desirable and in the best interests of each of the Filing Entities, their creditors, and other interested parties, that each Governing Authority authorize that the applicable Filing Entity seek relief under the provisions of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>");

FURTHER RESOLVED, that each Filing Entity is hereby authorized, and each of the officers thereof (each, an "<u>Authorized Person</u>" and, collectively, the "<u>Authorized Persons</u>") shall be, and hereby is, authorized and directed on behalf of each Filing Entity to commence a case under chapter 11 of the Bankruptcy Code (a "<u>Chapter 11 Case</u>") by executing, verifying and delivering a voluntary petition in the name of such Filing Entity under Chapter 11 of the Bankruptcy Code and causing the same to be filed with the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>") in such form and at such time as the Authorized Person executing said petition shall determine;

FURTHER RESOLVED, that each Filing Entity is hereby authorized, and each Authorized Person shall be, and hereby is, authorized and directed on behalf of such Filing Entity, to seek to have its Chapter 11 Case jointly administered by the Bankruptcy Court with the separate cases commenced by each of the other

Filing Entities under Chapter 11 of the Bankruptcy Code (each respective Chapter 11 Case together with such other Chapter 11 Cases, the "Chapter 11 Cases");

FURTHER RESOLVED, that each Filing Entity is hereby authorized, and each Authorized Person shall be, and hereby is, authorized and empowered, with full power of delegation, on behalf of and in the name of such Filing Entity, to execute, verify and/or file, or cause to be filed and/or executed or verified (or direct others to do so on their behalf as provided herein), and to amend, supplement or otherwise modify from time to time, all necessary or appropriate documents, including, without limitation, petitions, affidavits, schedules, motions, lists, applications, pleadings and other documents, agreements and papers, including all credit documents, and to take any and all actions that each Authorized Person deems necessary or appropriate, each in connection with the Chapter 11 Cases;

FURTHER RESOLVED, that each Filing Entity is hereby authorized, and each Authorized Person shall be, and hereby is, authorized and empowered, on behalf of and in the name of such Filing Entity, to the extent applicable, to obtain debtor-in-possession financing and/or the use of cash collateral, in such amounts and on such terms as may be agreed by any Authorized Person, including the grant of replacement liens, as is reasonably necessary for the continuing affairs of such Filing Entity; and be it

FURTHER RESOLVED, that the Filing Entities are hereby authorized, and each Authorized Person shall be, and hereby is, authorized and empowered, on behalf of and in the name of the applicable Filing Entity, to enter into such forbearance agreements, waivers, amendments or modifications, or other supplements relating to the Filing Entities' existing indebtedness as may be deemed necessary or appropriate by such Authorized Person.

## SALE AND LIQUIDATION PROCESS

WHEREAS, the intention of each Governing Authority with respect to its applicable Filing Entity is to use the Bankruptcy Code to continue the implementation an orderly wind down of its business and sale and/or liquidation of its assets to maximize value for the benefit of each Filing Entity's stakeholders;

WHEREAS, there has been presented to the Governing Authorities that certain Letter Agreement Governing Assets Disposition, by and among IG Design Group Americas, Inc. ("IDGA") on behalf of the Filing Entities, and Hilco Merchant Resources, LLC, dated June 29, 2025, and attached as Exhibit A hereto (the "Liquidation Services Agreement"), entry into which was previously authorized by the Independent Director of the Board of IDGA; and

WHEREAS, each Governing Authority with respect to its applicable Filing Entity has determined that it is fair to, advisable, and in the best interests of each Filing Entity, its creditors, and other stakeholders to authorize, confirm, ratify, and approve IDGA's entry into the Liquidation Services Agreement and authorize the execution of any other documents, agreements, certificates, instruments, and documents attached thereto, referred to therein, contemplated to be delivered by such Filing Entity in connection therewith or otherwise ancillary to or reasonably necessary in connection therewith or with the transactions contemplated thereby, including, any exhibits, schedules, appendices and annexes to such document, agreements, certificates and instruments (collectively, with the Liquidation Services Agreement, the "Liquidation Services Documents"), to perform its relevant obligations under the Liquidation Services Agreement and each other Liquidation Services Document and to consummate each of the transactions contemplated thereby.

NOW, THEREFORE, BE IT RESOLVED, that, subject to any approval of the Bankruptcy Court, as required in the Chapter 11 Cases, that entry into the Liquidation Services Agreement and each of the other Liquidation Services Documents is hereby authorized, confirmed, ratified, and approved, in each case,

with such additions thereto, changes therein or deletions therefrom, as such Authorized Person executing the same on behalf of IDGA may deem necessary, appropriate, advisable or desirable, the execution thereof to be conclusive evidence of any such determination; and be it

FURTHER RESOLVED, that the performance by IDGA of its obligations and the consummation of each of the transactions contemplated by the Liquidation Services Agreement and each of the other Liquidation Services Documents to which it is party are hereby in all respects authorized, confirmed, ratified and approved; and be it

FURTHER RESOLVED, that each Authorized Person be, and hereby is, authorized, directed, and empowered, on behalf of and in the name of each Filing Entity, to continue the marketing for sale of each Filing Entity's assets and pursue negotiations with any interested parties regarding one or more sales of such assets pursuant to section 363 of the Bankruptcy Code or otherwise; and be it

FURTHER RESOLVED, that, each applicable Governing Authority acting with respect to its applicable Filing Entity, hereby authorizes and directs each of the Authorized Persons to continue and/or commence a bidding and sale process for the Filing Entities' assets and pursue negotiations with any interested parties regarding a sale of such assets pursuant to section 363 of the Bankruptcy Code or otherwise; which may include the sale of assets of the applicable Filing Entity or its applicable business unit as a going concern or as a liquidation of such assets, in each case as such Authorized Person may deem necessary, appropriate, advisable or desirable, the approval and implementation thereof to be conclusive evidence of any such determination; and be it

FURTHER RESOLVED, that, in the judgment of the Governing Authority of each Filing Entity, it is desirable and in the best interest of each such Filing Entity, its creditors, and other parties in interest that each such Filing Entity use the Chapter 11 Cases to implement an orderly wind down of its business and sale and/or liquidation of certain of its assets and hereby authorizes and directs each of the Authorized Persons to implement such process for the applicable Filing Entity; which liquidation and wind down may include the liquidation of certain assets immediately, the prompt dissolution, liquidation and wind down of certain dormant Filing Entities as soon as reasonably practicable and the ultimate dissolution, liquidation and wind down of the other Filing Entities as soon as reasonably practicable following any sales of assets or business units pursuant to section 363 of the Bankruptcy Code or otherwise, in each case as such Authorized Person may deem necessary, appropriate, advisable or desirable, the approval and implementation thereof to be conclusive evidence of any such determination.

## DEBTOR-IN-POSSESSION FINANCING

WHEREAS, the Governing Authorities have determined that it is in the best interests of IDGA, as borrower (the "Borrower"), and each of the other entities listed on Schedule 3 hereto as a Loan Party (each, a "Loan Party" and collectively, the "Loan Parties") to obtain a senior secured debtor-in-possession term loan credit facility in an aggregate principal amount of up to $54 million (the "DIP Facility"), the proceeds of which shall be used, among other things, (i) to the extent permitted in accordance with the Interim DIP Order and the Final DIP Order (each as defined in the DIP Credit Agreement (as defined below)), (ii) to convert prepetition obligations into obligations under the DIP Facility, (iii) to fund the Chapter 11 Cases and the wind down of each Filing Entity (and any of its subsidiaries), and (iv) in any manner specified in the DIP Credit Agreement;

WHEREAS, there has been presented to the applicable Governing Authority of each Loan Party a summary of the proposed financing transactions, which describes in satisfactory detail to such applicable Governing Authority, the proposed terms and conditions of the DIP Facility, the DIP Loan Documents (as

defined below), and the transactions to be entered into in connection with the DIP Facility (the "<u>DIP Transactions</u>");

WHEREAS, in connection with the DIP Transactions, (i) each Loan Party will be required to enter into that certain Senior Secured Superpriority Debtor-In-Possession Loan Agreement and Security Agreement with respect to the DIP Facility (including all exhibits and schedules thereto, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among the Borrower, as the debtor and debtor-in-possession in the Chapter 11 Cases and the borrower under the DIP Facility, the other Loan Parties, as the guarantors of the DIP Facility, any other guarantor from time to time party thereto and HCS 107, LLC, as the lender (together with its permitted assigns in such capacity, the "<u>Lender</u>");

WHEREAS, as a condition to the extension of financing to the Borrower under the DIP Credit Agreement, each applicable Loan Party will be required to (i) enter into the DIP Credit Agreement as a borrower or guarantor thereunder, as applicable, (ii) grant a security interest in, and liens on, substantially all (subject to certain exceptions specified in the DIP Loan Documents) of their respective assets in favor of the Lender, to secure the payment and performance of the obligations under the DIP Credit Agreement and the DIP Loan Documents related thereto (the "<u>Obligations</u>"), (iii) guarantee the Obligations in accordance with the terms specified in the applicable DIP Loan Documents, and (iv) enter into, execute and deliver certain additional agreements, documents and items in connection therewith, including, but not limited to, one or more of the following (together with the DIP Credit Agreement, collectively, the "<u>DIP Loan Documents</u>"):

(i)  any promissory notes, intercreditor agreements, subordination agreements, intercompany notes, or similar documents or instruments,

(ii)  any fee letters or other side letters, and

(iii) certain other collateral and ancillary documents, including, but not limited to, intellectual property security agreements, mortgages, deeds of trust, deposit account control agreements, securities account control agreements and such other agreements, instruments, certificates, guarantees, acknowledgements or documents contemplated by the DIP Credit Agreement and the other DIP Loan Documents;

WHEREAS, the applicable Governing Authority for each Loan Party has determined that such Loan Party and its subsidiaries will derive direct and indirect benefits from the DIP Facility and the funding provided to the Borrower from time to time under the DIP Credit Agreement;

WHEREAS, the applicable Governing Authority of each Loan Party, acting in good faith, has determined that it would be advisable and in the best interest of, and will be beneficial to, such Loan Party and its respective subsidiaries to (i) enter into the DIP Credit Agreement, (ii) consummate the DIP Transactions, and (iii) enter into, execute, deliver and perform their respective obligations under the DIP Loan Documents to which they are (or are to be) a party, in each case, on such terms and conditions as deemed necessary or appropriate by the Authorized Persons; and

WHEREAS, the Governing Authority of each Loan Party desires to approve the recitals and resolutions and take the actions required in connection with the DIP Transactions as set forth below.

NOW, THEREFORE, BE IT RESOLVED, that (i) the entry into the DIP Facility and the other DIP Transactions (including the terms and conditions thereof, and any amendments, modifications or deletions thereto or any increase in the principal amount of any obligations, in each case, as any applicable

4

Authorized Person may deem necessary or appropriate, and with the execution of any DIP Loan Documents with respect thereto by such Authorized Person constituting conclusive evidence of such Authorized Person's and the applicable Governing Authority's approval thereof) be, and they hereby are, in all respects, authorized and approved, and (ii) any Authorized Person be, and each of them acting alone hereby is, authorized, empowered and directed, for and on behalf of such Loan Party, to obtain the DIP Facility and consummate the DIP Transactions; and be it

FURTHER RESOLVED, that the DIP Credit Agreement and the other DIP Loan Documents to which the applicable Loan Party is a party, in the form and substance and on such terms and conditions as negotiated and approved by any applicable Authorized Person (such approval to be conclusively evidenced by such applicable Authorized Person's execution and delivery thereof), and any amendments, amendments and restatements, refinancings, replacements, extensions, joinders, supplements, waivers, forbearances or other modifications of any of the foregoing as shall be approved by an applicable Authorized Person (such approval to be conclusively evidenced by such applicable Authorized Person's execution and delivery thereof) be, and they hereby are, in all respects, authorized and approved; and be it

FURTHER RESOLVED, that (i) the consummation of the DIP Transactions by each applicable Loan Party, (ii) the incurrence and performance by each applicable Loan Party of its obligations under such DIP Loan Documents (including, without limitation, the borrowing by the Borrower on the date of the closing of the DIP Facility and from time to time thereafter and permitted under the DIP Credit Agreement, the guarantee of Obligations and grant of security interests and pledges by each applicable Loan Party, in each case, under and pursuant to the DIP Credit Agreement and the other DIP Loan Documents, as any of them may be amended or otherwise modified from time to time, and any additional liens pursuant to any additional guarantees, mortgage agreements, security agreements, pledge agreements, control agreements or deeds of trust that the Lender may require, and the execution of documents, agreements, financing statements, mortgages and instruments in connection therewith), and (iii) all actions incidental to or in furtherance of the foregoing, including, without limitation, the authorization of all such acts, deeds and things, the selection of all such lenders, agents and other representatives, and the execution and delivery of the DIP Loan Documents and all other such agreements, documents, instruments, certificates or guarantees (together with any amendments, restatements, modifications and supplements thereto) as any applicable Authorized Person deems necessary, desirable or appropriate to effectuate or carry out fully the actions described above, be, and they hereby are, in all respects, authorized and approved; and be it

FURTHER RESOLVED, that each of the applicable Authorized Persons acting together or singly is hereby authorized, directed and empowered to negotiate, execute and deliver, or cause to be executed and delivered, the DIP Credit Agreement and the other DIP Loan Documents and any such amendments, restatements, amendments and restatements, refinancings, replacements, extensions, joinders, supplements, waivers, forbearances and other modifications thereto, with such terms and provisions as may be approved by the applicable Authorized Person executing the same (such approval to be conclusively evidenced by such applicable Authorized Person's execution and delivery thereof) and to cause funds to be advanced to the Borrower under the DIP Credit Agreement; and be it

FURTHER RESOLVED, that each of the applicable Authorized Persons, acting together or singly, is hereby authorized, directed and empowered to pay or cause to be paid the consideration, fees, taxes and expenses as contemplated in the DIP Loan Documents or reasonably related thereto; and be it

FURTHER RESOLVED, that each of the applicable Authorized Persons, acting together or singly, is hereby authorized, directed and empowered to pledge stock certificates and promissory notes and negotiate, execute, deliver, record and/or file all financing statements, intellectual property filings, stock powers, proxies, note powers, and other documents, to do all other acts as may be required, appropriate or

necessary to carry out and perform the DIP Loan Documents and to consummate any and all of the transactions contemplated by such documents (such requirement, appropriateness and necessity to be conclusively evidenced by such applicable Authorized Person or applicable Authorized Persons taking such actions or executing and delivering such documents, as applicable); and be it

FURTHER RESOLVED, that, to the extent any Filing Entity constitutes the Governing Authority of any of the direct or indirect subsidiaries or other affiliates of any Loan Party (any such entity, a "Controlled Entity"), the Authorized Persons of such Filing Entity are hereby authorized to take any actions necessary, including the execution of resolutions and written consents and the execution of any DIP Loan Documents to approve the entry of such Loan Party into the DIP Transactions and the DIP Loan Documents or to enter into any DIP Loan Documents on behalf of such Controlled Entity; and be it

FURTHER RESOLVED, that all actions of any such applicable Authorized Person taken pursuant to the authority granted herein, or having occurred prior to the date hereof in order to execute and deliver the DIP Loan Documents and effect such transactions contemplated thereby, are hereby approved, adopted, ratified and confirmed in all respects; and be it

FURTHER RESOLVED, that each of the applicable Authorized Persons, acting together or singly, is hereby authorized directed and empowered to act on behalf of each applicable Filing Entity, in its role as director, member, manager or shareholder, as applicable, of any subsidiary of such applicable Filing Entity, to act on behalf of each such subsidiary to cause any such subsidiary to take any of the actions referred to above, and to take any action deemed necessary or advisable by such Authorized Person (including by written consent) to authorize any subsidiary of such applicable Filing Entity to take any and all of the foregoing actions contemplated by the foregoing resolutions.

## RETENTION OF PROFESSIONALS

NOW, THEREFORE, BE IT RESOLVED, that each Filing Entity is hereby authorized, and each Authorized Person shall be, and hereby is, authorized, directed and empowered, on behalf of and in the name of the relevant Filing Entity, to employ and retain (i) Latham & Watkins LLP to act as bankruptcy counsel, (ii) Huron Consulting Services LLC to act as investment banker, financial advisor, and to provide the services of the Chief Strategy Officer and Deputy Chief Strategy Officer, (iii) Kroll Restructuring Administration LLC to act as claims, noticing, and solicitation agent, (iv) Deloitte Tax LLP, to act as tax services provider, (v) Liskow & Lewis, APLC to act as conflicts counsel, and (vi) C Street Advisory Group, LLC to act as communications advisor (collectively, the "Professionals"), in each case, in connection with the Chapter 11 Cases;

FURTHER RESOLVED, that each Filing Entity is hereby authorized, and each Authorized Person shall be, and hereby is, authorized, directed and empowered, on behalf of and in the name of such Filing Entity, to employ and retain such further legal, restructuring, financial, accounting and bankruptcy services firms as may be deemed necessary or appropriate by each Authorized Person to assist each Filing Entity in carrying out its responsibilities in the Chapter 11 Cases and achieving a successful reorganization; and be it

FURTHER RESOLVED, that each Filing Entity is hereby authorized, and each Authorized Person shall be, and hereby is, authorized and empowered, with full power of delegation, in the name and on behalf of such Filing Entity, to take or cause to be taken any and all such further action and to execute and deliver or cause to be executed or delivered, and to amend, supplement or otherwise modify from time to time, all such further agreements, documents, certificates, statements, notices, undertakings and other writings, and to incur and to pay or direct payment of all such fees and expenses, as in the judgment of the Authorized

Person shall be necessary, appropriate or advisable to effectuate the purpose and intent of any and all of the foregoing resolutions.

## GENERAL AUTHORITY

NOW, THEREFORE, BE IT RESOLVED, that all acts lawfully done or actions lawfully taken by any Authorized Person or any of the Professionals in connection with the Chapter 11 Cases or any proceedings or matters related thereto (including, without limitation, the DIP Transactions and the DIP Loan Documents), be, and hereby are, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Filing Entities;

FURTHER, RESOLVED, that the Board of IDGA hereby unanimously deems it in the best interest of IDGA and its sole stockholder to amend the organizational documents of IDGA (including its Bylaws) to provide that in the event that any director on the Board of IDGA recuses himself or herself with respect to voting on, approving or consenting to any matter, that the other remaining director of the Board of IDGA (the "Non-Recused Director") shall have the sole authority to vote on, approve or consent to such matter, and shall constitute a quorum and majority of the Board, in each case solely with respect to such matter, and the Board of IDGA hereby unanimously authorizes and approves the foregoing amendment and all prior matters voted on, approved or consented to by such Non-Recused Director are hereby ratified, confirmed, approved and adopted in all respects;

FURTHER RESOLVED, that all actions taken and agreements and documents executed by the Authorized Persons, or any person or persons designated and authorized to act by any of them, prior to the adoption of these resolutions which would have been authorized by these resolutions had such actions been taken (or documents been executed) after adoption of these resolutions, are ratified, confirmed, approved and adopted in all respects;

FURTHER RESOLVED, that each of the Authorized Persons, acting together or singly, of each applicable Filing Entity be, and each of them hereby is, authorized, directed and empowered on behalf of such applicable Filing Entity to take all such steps and do all such acts and things as they or any one or more of them shall deem necessary or advisable to proceed with the transactions contemplated by the foregoing resolutions, including, but not limited to, the making of any and all payments, the making and execution of any necessary or advisable instruments, certificates, affidavits or other documents in connection therewith, the signing or endorsement of any check, posting of any bonds, and the payment of any fees in such connection, and to take any and all action to make, execute, verify and file all applications, certificates, documents or other instruments and to do any and all acts and things that any one or more of them shall deem necessary, advisable or appropriate in order to carry out the intent and purpose of any and all of the foregoing resolutions;

FURTHER RESOLVED, that all actions heretofore taken in the name and on behalf of each applicable Filing Entity by any Authorized Person of such applicable Filing Entity in connection with or otherwise in contemplation of any of the foregoing resolutions or the transactions contemplated thereby be, and the same hereby are, approved, adopted, ratified and confirmed in all respects; and be it

FURTHER RESOLVED, that the omission from these resolutions of any agreement, document, or other arrangement contemplated by any of the agreements, documents, or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirement of any of the agreements, documents or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Persons acting singly to take, or cause to be taken, all actions necessary, desirable, advisable, or appropriate to consummate, effectuate, carry out, or further the DIP Transactions,

and the intent and purposes of the DIP Loan Documents and any documents related thereto, or the foregoing resolutions.

This Omnibus Consent may be executed in counterparts, including by facsimile, pdf., DocuSign or other electronic means, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.  This Omnibus Consent shall be effective as of the date first set forth above.

*[signature pages follow]*

The undersigned, being all of the members of the Boards listed on <u>Schedule 2</u>, do hereby approve the foregoing.

**BOARD OF DIRECTORS
OF IG DESIGN GROUP
AMERICAS, INC.**

_____
Eric Kaup

_____
Durc Savini

*[Signature Page to Omnibus Consent]*

The undersigned, being all of the members of the Boards listed on <u>Schedule 2</u>, do hereby approve the foregoing.

**BOARD OF DIRECTORS**
**OF IG DESIGN GROUP**
**AMERICAS, INC.**

_____
Eric Kaup

Signed by:

_____
6289C21CDFFF4405
Durc Savini

[*Signature Page to Omnibus Consent*]

**BOARD OF DIRECTORS OF IG DESIGN GROUP (LANG), INC.**

**BOARD OF DIRECTORS OF IMPACT INNOVATIONS, INC.**

**BOARD OF DIRECTORS OF CSS INDUSTRIES, INC.**

**BOARD OF DIRECTORS OF THE LANG COMPANIES, INC.**

**BOARD OF GOVERNORS OF VARIETY ACCESSORIES, LLC**

**BOARD OF GOVERNORS IMPACT PAPER PRODUCTS, LLC**

**BOARD OF DIRECTORS OF SIMPLICITY CREATIVE CORP.**

**BOARD OF DIRECTORS OF W.J.S. FURNITURE, INC.**

**BOARD OF DIRECTORS OF THE MCCALL PATTERN COMPANY, INC.**

**BOARD OF MANAGERS OF C.R. GIBSON, LLC**

**BOARD OF DIRECTORS OF PAPER MAGIC DISTRIBUTION, INC.**

**BOARD OF MANAGERS OF BERWICK OFFRAY LLC**

**BOARD OF DIRECTORS OF MCCALL DISTRIBUTION, INC.**

**BOARD OF DIRECTORS OF CRG DISTRIBUTION, INC.**

**BOARD OF DIRECTORS OF BOC DISTRIBUTION, INC.**

**BOARD OF MANAGERS OF LION RIBBON COMPANY, LLC**

**BOARD OF DIRECTORS OF LION RIBBON TEXAS CORP. (F/K/A LR TEXAS CORP.)**

Signed by:

1D8D822C8461433
Sue Buchta

DocuSigned by:

Jamie Rongone
86C6F18696184C0
Jamie Rongone

[*Signature Page to Omnibus Consent*]

On behalf of each of:

**IG DESIGN GROUP AMERICAS, INC., as Sole Member of ANKER PLAY PRODUCTS, LLC**

**CSS INDUSTRIES, INC., as Sole Member of PAPER MAGIC GROUP, LLC**

**PAPER MAGIC GROUP, LLC, as Sole Member of PHILADELPHIA INDUSTRIES, LLC**

**BERWICK OFFRAY LLC, as Sole Member of BERWICK MANAGEMENT LLC**

By: _____

Name:    Sue Buchta

Title:    President and Chief Executive Officer

*[Signature Page to Omnibus Consent]*

The undersigned, being all of the Equityholders listed on <u>Schedule 1</u>, do hereby approve the foregoing (and solely with respect to Impact Innovations, Inc., the Equityholder approves these resolutions notwithstanding Section 7 of the Bylaws of Impact Innovations, Inc.).

**On behalf of:**

**HUK 168 Limited**

By: _James Turner_

Name:    James Turner

Title:    Director

**On behalf of each of:**

| | | |
|---|---|---|
| **IG DESIGN GROUP AMERICAS, INC.** | **IG DESIGN GROUP (LANG), INC.** | **IMPACT INNOVATIONS, INC.** |
| **CSS INDUSTRIES, INC.** | **PAPER MAGIC GROUP, LLC** | **THE MCCALL PATTERN COMPANY, INC.** |
| **C.R. GIBSON, LLC** | **BERWICK OFFRAY LLC** | **LION RIBBON COMPANY, LLC** |

By: _Sue Buchta_

Name:    Sue Buchta

Title:    President and Chief Executive Officer

*[Signature Page to Omnibus Consent]*

**SCHEDULE 1**

**Equityholders**

1.  HUK 168 Limited, as the Sole Shareholder of IG Design Group Americas, Inc.

2.  IG Design Group Americas, Inc., as the Sole Member of Anker Play Products, LLC

3.  IG Design Group Americas, Inc., as the Sole Shareholder of IG Design Group (Lang), Inc.

4.  IG Design Group Americas, Inc., as the Sole Shareholder of Impact Innovations, Inc.

5.  IG Design Group Americas, Inc., as the Sole Shareholder of CSS Industries, Inc.

6.  IG Design Group (Lang), Inc., as the Sole Shareholder of The Lang Companies, Inc.

7.  Impact Innovations, Inc., as the Sole Member of Variety Accessories, LLC

8.  Impact Innovations, Inc., as the Sole Member of Impact Paper Products, LLC

9.  CSS Industries, Inc., as the Sole Shareholder of Simplicity Creative Corp.

10. CSS Industries, Inc., as the Sole Shareholder of W.J.S. Furniture, Inc.

11. CSS Industries, Inc., as the Sole Member of Paper Magic Group, LLC

12. CSS Industries, Inc., as the Sole Shareholder of The McCall Pattern Company, Inc.

13. Paper Magic Group, LLC, as the Sole Member of C.R. Gibson, LLC

14. Paper Magic Group, LLC, as the Sole Member of Philadelphia Industries, LLC

15. Paper Magic Group, LLC, as the Sole Shareholder of Paper Magic Distribution, Inc.

16. Paper Magic Group, LLC, as the Sole Member of Berwick Offray LLC

17. The McCall Pattern Company, Inc., as the Sole Shareholder of McCall Distribution, Inc.

18. C.R. Gibson, LLC, as the Sole Shareholder of CRG Distribution, Inc.

19. Berwick Offray LLC, as the Sole Member of Berwick Management LLC

20. Berwick Offray LLC, as the Sole Shareholder of BOC Distribution, Inc.

21. Berwick Offray LLC, as the Sole Member of Lion Ribbon Company, LLC

22. Lion Ribbon Company, LLC, as the Sole Shareholder of Lion Ribbon Texas Corp.

## SCHEDULE 2

### Boards

1. Board of Directors of IG Design Group Americas, Inc.

2. Board of Directors of IG Design Group (Lang), Inc.

3. Board of Directors of Impact Innovations, Inc.

4. Board of Directors of CSS Industries, Inc.

5. Board of Directors of The Lang Companies, Inc.

6. Board of Governors of Variety Accessories, LLC

7. Board of Governors of Impact Paper Products, LLC

8. Board of Directors of Simplicity Creative Corp.

9. Board of Directors of W.J.S. Furniture, Inc.

10. Board of Directors of The McCall Pattern Company, Inc.

11. Board of Managers of C.R. Gibson, LLC

12. Board of Directors of Paper Magic Distribution, Inc.

13. Board of Managers of Berwick Offray LLC

14. Board of Directors of McCall Distribution, Inc.

15. Board of Directors of CRG Distribution, Inc.

16. Board of Directors of BOC Distribution, Inc.

17. Board of Managers of Lion Ribbon Company, LLC

18. Board of Directors of Lion Ribbon Texas Corp. (f/k/a LR Texas Corp.)

**SCHEDULE 3**

**Filing Entities**

1.  IG Design Group Americas, Inc.

2.  Anker Play Products, LLC

3.  IG Design Group (Lang), Inc.

4.  Impact Innovations, Inc.

5.  CSS Industries, Inc.

6.  The Lang Companies, Inc.

7.  Variety Accessories, LLC ("Variety")

8.  Impact Paper Products, LLC ("Impact")

9.  Simplicity Creative Corp.

10. W.J.S. Furniture, Inc.

11. Paper Magic Group, LLC

12. The McCall Pattern Company, Inc.

13. C.R. Gibson, LLC

14. Philadelphia Industries, LLC

15. Paper Magic Distribution, Inc.

16. Berwick Offray LLC

17. McCall Distribution, Inc.

18. CRG Distribution, Inc.

19. Berwick Management LLC ("Berwick")

20. BOC Distribution, Inc.

21. Lion Ribbon Company, LLC

22. Lion Ribbon Texas Corp. (f/k/a LR Texas Corp.)

The Filing Entities—other than Variety, Impact, and Berwick—are referred to herein, individually, as a "Loan Party" and collectively as "Loan Parties".

## **EXHIBIT A**

**Liquidation Services Agreement**



June 29, 2025

*VIA EMAIL*
Brett M. Anderson
Chief Strategy Officer
IG Design Group Americas, Inc.
2015 West Front Street
Berwick, PA 18603

Re:    **Letter Agreement Governing Assets Disposition**

Dear Sue:

By executing below, this letter shall serve as an agreement (this "Agreement") between Hilco Merchant Resources, LLC, on the one hand ( "Hilco" or a "Party"), and IG Design Group Americas, Inc. (on behalf of itself and any of its affiliates and/or subsidiaries), on the other hand ("Company" or a "Party" and together with the Hilco, the "Parties"), under which Hilco shall act as the exclusive disposition agent to assist in the preparation, marketing and disposition of the Assets (as defined below) located at the Company's locations set forth on Exhibit A and elsewhere as the Parties may mutually agree in writing through amendment to this Agreement (each a "Location" and collectively, the "Locations").[1]

A.    **Assets (Inventory and PP&E)**

Hilco shall use commercially reasonable efforts to market and sell (a) the raw materials, work-in-process, and finished goods inventory at the Locations, and any other such inventory and goods that the Parties agree in writing (collectively, the "Inventory") other than the Excluded Inventory (defined below) and (b) the owned furnishings, trade fixtures, machinery, equipment, rolling stock, vehicles, and other personal property assets that are located in the Locations or located elsewhere (collectively, the "PP&E", together with the Inventory, collectively, the "Assets").  The Inventory to be sold by Hilco pursuant to this paragraph expressly excludes inventory that the Company advises Hilco in writing (i) relates to a business unit that is being marketed for sale by the Company as a going concern and (ii) has been identified for sale to an existing customer pursuant to a purchase order that exists as of the date of this Agreement has yet to be fulfilled (collectively, the "Excluded Inventory").  A listing of the Excluded Inventory is set forth on Exhibit B.[2]  Additionally, at Company's request and at a commercially reasonable time to be designated by Company in writing (email being sufficient), Hilco will devote sales resources that are adequate to assist Company in assuming responsibility for overseeing sales of Inventory to Company's existing customers; *provided, however,* that the date upon which Hilco will undertake responsibility for the sale of "everyday

---

[1] Company understands and agrees that Hilco may retain certain of its affiliates to assist with or provide certain disposition and other services in connection with this Agreement and the services hereunder. If Hilco engages one or more of its affiliates in connection with this Agreement, Hilco may share with such affiliate all information, including Confidential Information relating to Company and/or this Agreement.

[2] The identification of the Excluded Inventory shall be provided to Hilco as soon as practicable following the date of this Agreement but in no event less than ten (10) business days.

replenished inventory" shall be after Hilco is provided with commercially reasonable notice thereof and shall be separately designated by Company and, until such designated date, shall constitute Excluded Inventory.

For the avoidance of doubt, the Parties may agree that Hilco will provide the Services (as defined herein) with respect to additional assets, which additional assets shall be designated in writing and deemed "Assets" for all purposes of this Agreement. The Parties further agree that Assets does not include damaged or defective assets or assets that cannot be sold.

**B.** **Services** Hilco shall provide the following services (the "Services") on behalf of and in collaboration with the Company:

(a)  Subject to the provisions herein, market the Assets for sale, negotiate the terms of sales of the Assets and assist Company with implementing any such agreements reached with purchasers. The Parties understand and agree as follows: (i) Hilco is acting as an agent of Company to facilitate the Company's sale of the Assets, and (ii) all sold Assets will be sold by Company as the owner of the Assets and not by Hilco and that Hilco has no right, title or interest in the Assets; and

(b)  Hilco may: (i) provide qualified supervisors (the "Supervisors") engaged by Hilco to oversee the sale of the Assets from the Locations; (ii) determine any appropriate advertising for the Locations and the Assets; (iii) in consultation with the Company, determine appropriate pricing and discounts of Assets; (iv) recommend appropriate methods and processes for the sale of the Assets, including through wholesale channels or other bulk sale or disposition; and (v) provide such other related services deemed necessary or appropriate by Company and Hilco.

(c)  The Parties expressly acknowledge and agree that Hilco shall have no liability to Company's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Company's employment, hiring or retention of its employees, and such employees shall not be considered employees of Hilco;

**C.** **Company Undertakings and other Provisions**

(a)  The Parties expressly acknowledge and agree that Company shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Hilco's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Company;

(b)  During the Term (as defined in Section H of this Agreement) and at all relevant times, Company shall (i) be the employer of the Locations' employees; (ii) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Locations, the Locations' employees and other representatives of Company; (iii) prepare and process all tax forms and other related documentation; (iv) collect all sales taxes and timely pay them to the appropriate taxing authorities; (v) to the best of its ability, cause

2

Company's employees to accurately fulfill all sale orders of Assets and related sale documents and purchase agreements, including (without limitation) issuing purchase orders and invoices, picking, sorting, and packing the Assets according to each order, preparing packing slips and bills of lading, loading the Assets onto purchasers' trucks, and shipping the Assets according to each sale order, all at no cost or expense to Hilco, and otherwise cooperate with Hilco and its Supervisors in connection with the marketing and sale of the Assets; (vi) be responsible for all costs, expenses, fees and charges associated with issuing purchase orders and invoices, picking, sorting, packing, and preparing the Assets for shipment, including loading the Assets onto purchasers' trucks (vii) execute all agreements determined by the Company and Hilco to be necessary or desirable for the sales and Hilco's performance of its obligations under this Agreement; (viii) maintain all existing systems and processes necessary or appropriate for the marketing and sale of the Assets; (ix) apply for and obtain all applicable consents, permits and authorizations (including landlord approvals and consents) relating to access to the Locations and Assets and the Parties' performance under this Agreement; (x) to the extent necessary or appropriate, update Company systems and records to ensure purchasers of Assets purchase the Assets on an all sales final, no returns, refunds, exchanges, or setoffs/offsets basis; (xi) collect all accounts receivable in respect of purchases of Assets; (xii) to the extent practicable, provide Asset tracking, including (without limitation) reports in respect of all sales, Asset availability, and order fulfillment, shipping and handling; and (xiii) provide Hilco, as soon as practicable following the execution hereof, with evidence of all Asset testing and compliance reports and evidence, including those relating to the State of California USA's Safe Drinking Water and Toxic Enforcement Act of 1986/Proposition 65 ("Prop 65") and the results thereof to the extent applicable;

(c)  Company shall provide throughout the Term central administrative services reasonably necessary for Hilco to perform the Services, including (without limitation and to the extent reasonably practicable given the circumstances surrounding the Company's anticipated wind down) general administration, order processing, invoicing, and fulfillment, sales audit, cash reconciliation, accounting, employee oversight, benefits, and payroll processing, all at no cost to Hilco;

(d)  The Parties hereto agree, and the Company hereby expressly acknowledges, that Hilco shall not be responsible in any way, including for the removal or disposition of any toxic, harmful and/or environmentally hazardous chemicals, solvents, heavy metals, plastics, matters or substances found at or in the Assets or Locations (collectively, "Hazardous Substances") or obtaining or maintaining any Environmental Permits. Company shall be responsible for all Hazardous Substances, including but not limited to ensuring that Company possesses and is in compliance with all Environmental Permits that are required for the operation of the Company's business and any applicable laws, rules and regulations.  As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to legal requirements, rules or environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements, permissions and consents

3

which are required under or are issued pursuant to Environmental Laws. The Company hereby agrees to defend, indemnify and hold Hilco harmless from any and all claims, losses, penalties, fines damages and liabilities (including attorney's fees) of any kind whatsoever which arise from or are in connection with any Hazardous Substances found at or in the Assets or Locations or any violation of any Environmental Laws or Environmental Permits and any other applicable laws, rules and regulations; and

(e)     The Parties agree that all sales of the Assets shall be made on behalf of Company. All sales of Assets shall be by ACH, wire transfer and, at Company's discretion, by check or otherwise in accordance with Company's policies, and shall sold "as is where is" and "final" with no returns, refunds, or exchanges accepted or allowed.

## D.     Hilco Fee and Expenses

(a)     Inventory. From and after the date of this Agreement, in consideration of its Services relative to the marketing and sale of Inventory hereunder, Hilco shall earn a fee equal to ten percent (10%) of the Gross Proceeds of Inventory sold, regardless whether the sale transaction is arranged and/or consummated by Company employees, personnel, or other representatives or Hilco employees, Supervisors, personnel, or other representatives (the "Inventory Fee"). For purposes of this Agreement, "Gross Proceeds" means gross receipts, net of applicable sales taxes only; *provided, however*, for the avoidance of doubt, that Hilco shall not be entitled to receive an Inventory Fee with respect to the Excluded Inventory unless and until such time as Company designates Excluded Inventory as Inventory (which designation is deemed to occur if Company requests that Hilco market for sale such Excluded Inventory).

(b)     PP&E. In consideration of its Services relative to the PP&E hereunder, Hilco shall earn a fee equal to fifteen percent (15%) of the Gross Proceeds of PP&E sold (the "PP&E Fee", together with the Inventory Fee, collectively, the "Fees");

(c)     Expenses. Company shall be responsible for all costs, expenses, and taxes related to the Locations, Assets, and Company operations, including (without limitation) Hilco's reasonable, documented out of pocket costs and expenses related to the Services and the Supervisors (including industry standard deferred compensation), outside attorneys' fees, travel, marketing, advertising, and sales of the Assets (collectively, "Expenses");

(d)     Control and Distribution of Proceeds. With appropriate consideration given to Company's accounting needs, Company and Hilco shall work cooperatively with respect to the way in which  proceeds realized from the sale of the Assets (other than, for the avoidance of doubt, proceeds Company receives related to the sale of the Excluded Inventory) shall be paid to Hilco or Company. In instances in which Hilco receives the proceeds of sale, Hilco will remit Company's share of proceeds and sales taxes (net of Hilco's Fees and incurred Expenses as provided for in this Agreement) within ten (10) business days of Hilco's receipt of proceeds from the sale of such Assets;

(e)    <u>Accounting</u>. All accounting matters (including, without limitation, all Fees, Expenses, or other amounts reimbursable or payable to Hilco) shall be reconciled on every other Wednesday for the prior two week period and shall be paid within seven (7) days after each such bi-weekly reconciliation.  The Parties shall complete a final reconciliation and settlement of all amounts payable to/by Hilco and contemplated by this Agreement (including, without limitation, Expenses and Fees earned hereunder) no later than forty five (45) days following the conclusion of the sales and

(f)    <u>Expense Advance</u>. Upon execution of this Agreement, the Company shall pay by wire transfer to the Hilco an advance payment of $50,000 (the "<u>Expense Advance</u>") which shall be held by Hilco and applied towards Expenses as incurred.  Any portion of the Expense Advance not so used shall be returned to Company within five (5) business days following the final reconciliation.

## E.    **Indemnification**

(a)    <u>Company's Indemnification.</u> Company shall indemnify, defend, and hold Hilco and its consultants, members, managers, partners, officers, directors, employees, attorneys, agents, advisors, representatives, lenders, potential co-investors,  principals, affiliates, and Supervisors (collectively, "<u>Hilco Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Company or the Company Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Company; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Company employees (under a collective bargaining agreement or otherwise), or any other person (excluding Hilco Indemnified Parties) against Hilco or an Hilco Indemnified Party, except claims arising from Hilco's negligence, willful misconduct or unlawful behavior; (d) any claim, dispute or matter whereby allegations are made that Hilco is or was acting as the employer of any Company employees; (e) any harassment, discrimination or similar claim asserted against the Hilco Indemnified Parties for the alleged violation of any laws or regulations or any other unlawful, tortious or otherwise actionable conduct undertaken by Company or Company Indemnified Parties; (f) Company's failure to timely pay over to the appropriate taxing authority any taxes required to be paid,  to the appropriate taxing authorities by Company relating to the Assets, sales or this Agreement during the Term; and (g) any claim or recalls relating to the Assets, including, but not limited to claims or allegations that the Assets are in whole or in part, toxic, defective, damaged, unsafe or in violation of any rule, law or regulation.

(b)    <u>Hilco's Indemnification</u>. Hilco shall indemnify, defend and hold Company and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, and affiliates (other than the Hilco or the Hilco Indemnified Parties) (collectively, "<u>Company Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or

5

related to (a) the willful or negligent acts or omissions of Hilco or the Hilco Indemnified Parties; (b) the material breach of any provision of this Agreement by Hilco or Hilco's material failure to perform any obligation under this Agreement; (c) any liability or other claims made by Hilco's Indemnified Parties or any other person (excluding Company Indemnified Parties) against a Company Indemnified Party arising out of or related to Hilco's sale of the Assets, except claims arising from Company's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Company Indemnified Parties by Hilco or any of the Hilco Indemnified Parties or Company's customers; and (e) any claims made by any party engaged by Hilco as an employee, Hilco, representative or independent contractor arising out of such engagement.

F.  **Insurance**

(a)  Company's Insurance Obligations: Company shall maintain throughout the Term, liability insurance policies (including, without limitation, products liability, comprehensive public liability insurance and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with the Locations and the Assets and shall cause Hilco to be named an additional insured with respect to all such policies.  Upon execution hereof, Company shall provide Hilco with a certificate or certificates evidencing the insurance coverage required hereunder and that Hilco is an additional insured thereunder.  In addition, Company shall maintain throughout the Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(b)  Hilco's Insurance Obligations. Hilco shall maintain throughout the Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Hilco's provision of services at the Locations.  Hilco shall name Company as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Company with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Hilco shall maintain throughout the Term, workers compensation insurance compliance with all statutory requirements.

G.  **Representations, Warranties, Covenants and Agreements**

(a)  Company representations, warranties, covenants and agreements: Company warrants, represents, covenants and agrees that as of the date of execution of this Agreement (i) Company is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its

6

principal executive office at the address set forth herein; (ii) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Company and this Agreement constitutes a valid and binding obligation of Company enforceable against Company in accordance with its terms and conditions, and the consent of no other entity or person is required for Company to fully perform all of its obligations herein, subject to the obligations and approvals contemplated by Section H.j of this Agreement related to certain approvals to be obtained from the Bankruptcy Court (as defined below) (collectively the "Bankruptcy Court Approvals"); (iii) as of the date of execution of this Agreement, Company has all legal right and authority to sell the Assets pursuant to the obligation to seek Bankruptcy Court Approvals; (iv) Company has taken all necessary actions required to authorize the execution, delivery and performance of this Agreement and the related documents contemplated hereby and, other than the Bankruptcy Court Approvals, no further consent or approval is required for the Services, access to the Assets, for Company or Hilco to enter into and deliver the Agreement and to perform their obligations under the Agreement; (v) except with respect to the Bankruptcy Court Approvals, no court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for Company's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefore; (vi) other than with respect to (A) certain Assets identified on Exhibit C[3] that are subject to private label and other agreements that preclude their sale to third parties (collectively, the "Licensed Merchandise") and (B) assets that are subject to that certain IP License Deed dated May 30, 2025 between IG Design Group Plc (the "Former Parent") and IG Design Group Americas, Inc. (the "IP License Deed")[4], Company has the authority to grant the license to Hilco to market and sell the Assets, use any trade names associated with the Assets utilize the Locations and to use the Company's intellectual property as provided for under this Agreement; (vii) Hilco shall have access to the Assets, all related information, and the Locations five (5) days per week between 8:00 a.m. and 5:00 p.m. local time unless otherwise arranged with the Company and confirmed with 24 hours notice; (viii) the Asset representations and descriptions provided by the Company to Hilco are accurate, true and complete and may be relied upon by Hilco; (ix) all Assets are free and clear of all liens, claims, and encumbrances of any kind whatsoever other than (a) the prepetition liens granted in connection with the bridge financing obtained by Company on June 23, 2025 and (b) other liens identified to Hilco based upon UCC-1 lien searches undertaken prior to the execution of this Agreement; (x) other than restrictions related to the sale of the Licensed Merchandise and the sale of merchandise that is the subject of the IP License Deed, there are no known restrictions on the sales of the Assets, including but not limited to restricting sales of Assets within certain geographic areas, to certain purchasers or through any ecommerce channels and Hilco is hereby authorized, subject to the Bankruptcy Court Approvals, to sell the Inventory without restriction, including without limitation,

---

[3] The identification of such Assets shall be provided to Hilco as soon as practicable following the date of this Agreement but in no event less than ten (10) business days.
[4] Company and Hilco will use their collective reasonable best efforts to obtain the consent of the Former Parent to modify the IP License Deed in a manner that permits the sale under this Agreement of the applicable merchandise that is the subject of the IP License Deed (the "IP Deed Release").

selling the Inventory in domestic and international markets and through all e-commerce channels and that Company has obtained from the manufacturers of the Inventory all necessary rights to distribute and so sell the Inventory in domestic and international markets and, upon request by Hilco, the Company will provide documentation evidencing such rights; (xi) the Assets have been produced and labeled in accordance with the requirements of all applicable federal, state and local laws, rules and regulations and neither the Assets, nor any part thereof, including labeling and packaging violates Prop 65 or any federal, state or local law, rule or regulations; and (xii) any amounts due and payable hereunder to Hilco shall be free and clear of any liens, claims, or encumbrances of any kind whatsoever.

(b)     Hilco warrants, represents, covenants and agrees that (i) Hilco is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform the Hilco's obligations hereunder, and maintains its principal executive office at the addresses set forth herein; (ii) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Hilco and this Agreement constitutes a valid and binding obligation of Hilco enforceable against Hilco in accordance with its terms and conditions, and the consent of no other entity or person is required for Hilco to fully perform all of its obligations herein; (iii) Hilco shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities; and (iv) Hilco will not take any disciplinary action against any employee of Company.

## H.     General Provision

Term of Agreement. This Agreement shall terminate upon the earlier of completion of the Services, or as reasonably determined by the Parties and confirmed in writing by the Parties (the "Term"). If this Agreement terminates prior to the completion of any Services, Hilco will retain all Fees paid prior to the termination date, and shall be reimbursed for all unpaid Expenses incurred through the termination date. Hilco shall also retain its rights to any post-termination payments that may become payable under this Agreement. Hilco may terminate its relationship with the Company hereunder upon a material breach of this Agreement by Company which breach is not cured within ten (10) days after written notice of such breach by Hilco;

(b)     Notices. All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows:  (a) To Company: at the address listed above; (b) To Hilco: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax:  847- 849-0859, Attn: Office of the General Counsel; or (c) such other address as may be designated in writing by Company or Hilco;

(c)     Independent Consultant. Hilco's relationship to Company is that of an independent contractor without the capacity to bind Company in any respect. No employer/employee, principal/Hilco, joint venture or other such relationship is created by this Agreement. Company shall have no control over the hours that Hilco or its employees or assistants

8

or the Supervisors work or the means or manner in which the services that will be provided are performed and Hilco is not authorized to enter into any contracts or agreements on behalf of Company or to otherwise create any obligations of Company to third parties, unless authorized in writing to do so by Company;

(d)  <u>Non-Assignment</u>. Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided, however, that Hilco may syndicate this transaction with one or more third parties upon notice to, but not the consent of Company.  No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or Hilco of such Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns;

(e)  <u>Severability</u>. If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties;

(f)  <u>Governing Law, Venue, Jurisdiction and Jury Waiver</u>. This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of Illinois (without reference to the conflicts of laws provisions therein).  Company and Hilco waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Hilco against Company or Company against Hilco on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Company and Hilco, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect;

(g)  <u>Entire Agreement</u>. This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  All prior agreements, discussions and negotiations are entirely superseded by this Agreement;

(h)  <u>Confidential Information</u>. During the Term, the Parties may have access to and possession of trade secrets, confidential business information and proprietary information about the other Party, its clients, customers, and suppliers, (collectively, "<u>Confidential Information</u>").  Each Party agrees that it shall not disclose any

9

Confidential Information of the other Party to any third party and that each shall keep the other's Confidential Information in the strictest of confidence;

(i)     Execution. This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person;

(j)     Bankruptcy. If Company commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), with a bankruptcy court (the "Bankruptcy Court"), Company shall promptly file a motion to assume this Agreement under sections 363 and 365 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved by one or more orders that together provide, among other things, as follows:  (i) the payment to Hilco of all fees and reimbursement of reasonable expenses incurred hereunder is approved without further order of the Bankruptcy Court; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) notwithstanding the liens or claims of the Company's secured lender, including any debtor in possession financing lender, any amounts paid to Hilco hereunder, will not be reduced or capped by the terms or conditions of any DIP Credit Agreement or related order; (iv) all such fees and expenses due and owing to Hilco hereunder shall be included in any carve-out provided in any DIP Credit Agreement and Bankruptcy Court order approving such DIP Credit Agreement; (v) approval of Hilco's ability to commence and effectuate the Asset sales contemplated hereby; (vi) authorizing the sales of the Assets without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern such sales; (vii) authorizing the sales of the Assets notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict such sales or the necessity of obtaining any third party consents; and (viii) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.  In such event, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Company, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens.  From and after entry of an interim order approving Hilco's ability to continue the marketing and sale of the Assets, Hilco shall sell the Assets in accordance with the terms of such approval order in all material respects;

(k)     Survival. At the expiration of the Term or earlier termination (if applicable), if Hilco, in its sole discretion, elects to trigger a Survival Period (defined below), it shall notify

10

Company within ten (10) days of such expiration or termination, and shall at that time provide Company with a list of specific third parties ("Survival Prospect List") with whom Hilco has engaged in direct negotiations with respect to the Assets, and include all information relating to such negotiations with such third parties (each a "Survival Prospect"). If within one hundred eighty (180) days after the expiration of the Term of this Agreement or earlier termination (if applicable) (such period shall be referred to as the "Survival Period"), the Company and one or more Survival Prospect should enter into one or more written agreements to purchase all or any portion of the Assets or continue to purchase Assets under an agreement entered into during the Term, Hilco shall be entitled to a commission (the "Survival Prospect Commission") equal to and at the same percentage rate applicable to the Inventory or PP&E at the time of termination on all Proceeds generated by such Survival Prospect's purchases of Assets from Company during the Survival Period. Each such Survival Prospect Commission shall be paid by the Company to Hilco within five (5) business days of the Company's receipt of Proceeds from the Survival Prospect;

(l)   Company to Provide Photographs and Samples.   At the written request of Hilco, Company agrees that it shall, (i) at Company's sole cost and expense, deliver to Hilco photographs of product as available of the Assets and (ii) work cooperatively with Hilco from time to time to facilitate the provision of samples to Hilco;

(m)   Delivery of Inventory. All sales shall be made FOB the Location from which the Assets are shipped; and

(n)   Advertising and License. Other than with respect to the Licensed Merchandise and the Restricted Merchandise (subject to receipt of the IP Deed Release from the Former Parent), Hilco is authorized to market and sell the Assets with all logos, brand names, trade names, trademarks, copyrights, and other intellectual property on the Asset intact (collectively, the "Intellectual Property"). Other than with respect to the Licensed Merchandise and the Restricted Merchandise (subject to receipt of the IP Deed Release from the Former Parent), the Company hereby grants Hilco a limited, non-exclusive, royalty free, license to any and all Intellectual Property associated with Company and/or the Assets solely with respect to Hilco's Services and performance of its obligations related to this Agreement (the "License"). The License shall expire at the end of the Term.

(o)   Further Assurances. Each Party shall use all reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to carry out the intent and purposes of this Agreement including, but not limited to, seeking to terminate and/or reject in the Bankruptcy Court executory contracts with third parties that are inconsistent with the objectives of this Agreement.

*          *          *

11

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By:  T. Kellan Grant
Its:  EVP Commercial Counsel


**AGREED AND ACCEPTED as of the 29th day of June, 2025:**

IG DESIGN GROUP AMERICAS, INC.
(on behalf of itself and any of its affiliates
and/or subsidiaries)

By:   Brett M. Anderson
Its:   Chief Strategy Officer

12

# **EXHIBIT A**

## **Locations**

1. Shorewood, Illinois
2. Hagerstown, Maryland
3. Leesville, South Carolina

US-DOCS\161217389.11

**EXHIBIT B**

**<u>Excluded Inventory</u>**

**<u>[TO COME]</u>**

14

US-DOCS\161217389.11

**EXHIBIT C**

**<u>Licensed Merchandise</u>**

**<u>[TO COME]</u>**

US-DOCS\161217389.11